# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

UNITED STATES OF AMERICA )
                      )
v.                          )    **CRIM. NO. 89-00072-WS**
                      )
RICHARD JOSEPH LYNN  )

## UNITED STATES' RESPONSE TO LYNN'S
## REQUEST FOR EARLY RELEASE

The United States, by and through Richard W. Moore, the United States Attorney for the Southern District of Alabama, submits this response to Richard Joseph Lynn's *pro se* motion seeking early release under 18 U.S.C. § 3582(c)(1)(A). [Doc. No. 82.] This Court has already denied Lynn's motions for compassionate release on several occasions. This Court lacks jurisdiction to consider his latest motion because the evidence and arguments he cites were not presented to the Warden of his facility as required by § 3582.

If this Court were to find jurisdiction to consider Lynn's motion, it should deny it for two reasons. He has not carried his burden to show that he is eligible for a reduction in sentence. Even if he were eligible for a reduction in sentence, his sentence remains necessary and appropriate.

## I.    Background and Procedural History

### A.    Lynn's Conviction, Sentence, and Flight from Justice

As recounted by the Eleventh Circuit, "Lynn and his codefendants were charged with participating in an ongoing conspiracy to import cocaine by plane into Alabama from 1982 to 1989." *Lynn v. United States*, 365 F.3d 1225, 1227 (11th Cir. 2004).  During that seven-year period, the conspiracy "smuggled massive amounts of cocaine, at least 600 kilograms per load." *Id.*

At trial, the United States' theory of the case was that Lynn "principally directed and administered the criminal organization, which included pilots, personnel who refueled the planes in Belize, personnel who unloaded the cocaine in Alabama, radio operators who monitored law enforcement communications, and persons who distributed the cocaine." *Id.*  Lynn's codefendant Marshall worked as "an armed 'enforcer' who provided intimidation." *Id.*  The jury found Lynn guilty as charged. *Id.*

This Court found at sentencing that Lynn was the armed leader of an organization responsible for importing 13,200 kilograms of cocaine. *Id.* at 1227 n.3.  It sentenced him to concurrent terms of life in prison. *Id.* at 1227.

Lynn escaped from prison soon thereafter.  His appeal was pending at the time.  Based on the longstanding principle that a prisoner's escape

disentitles him to a pending appeal, the Eleventh Circuit dismissed his direct appeal. *Id.* at 1228.

Since the dismissal of his direct appeal, Lynn has challenged the validity of his convictions and sentence in various forms but this Court and the Eleventh Circuit have uniformly affirmed them. *See*, *e.g.*, *Lynn*, 365 F.3d 1225 *cert. denied* 543 U.S. 891 (2004); *Lynn v. United States*, 2015 WL 566912 (S.D. Ala. Feb. 11, 2015).

## B.    Lynn's Prior § 3582 Litigation

This Court denied Lynn's prior motion for a reduction in sentence under 18 U.S.C. § 3582. [Doc. No. 70.] It recounted that Lynn identified a "welter of health issues" that Lynn said made him eligible for a reduced sentence. [*Id.* at 2.] After describing Lynn's health issues in detail, however, this Court found that he had not identified a serious physical or mental condition that substantially diminished his ability to care for himself in a prison setting. [*Id.* at 4.] This Court also concluded that Lynn did not meet the criteria for a reduction in sentence based on his age because he was not yet 65 years old. [*Id.* at 2.] It denied Lynn's motion without prejudice "should his circumstances change." [*Id.* at 4.]

Lynn subsequently filed a motion to amend the judgment, which this Court construed as a motion to reconsider its § 3582 decision. This Court rejected Lynn's specific legal arguments in some detail. *United States v. Lynn*, 2019 WL 3805349 at (S.D. Ala. August 13, 2019) (Steele, J.). Most importantly, it concluded that the First Step Act did not expand

the Sentencing Commission's policy statement to include new, judicially-created definitions of the term "extraordinary and compelling." *Id.* at \*2–\*4.

On March 26, 2020, Lynn moved to "reopen" his motion for a reduction in his sentence based on "changed circumstances." [Doc. No. 80 at 1–2.] In the light of the COVID-19 pandemic, the conditions at his facility, and his "compromised health status," Lynn asked the Court to "reopen, and now grant" his motion for compassionate release. [*Id.*]

The Court denied Lynn's motion on April 1, 2020 because "there [was] nothing to 'reopen.'" [Doc. No. 81 at 1.] Rather, its decision on Lynn's prior § 3582 motion was final. [*Id.*]

The Court further explained that Lynn could not "bypass the procedure established by Congress for seeking compassionate release" and make a new motion "based on new circumstances." [*Id.*] "[I]nstead," the Court instructed, Lynn "must first seek relief through the Bureau of Prisons as described in 18 U.S.C. § 3582(c)(1)(A)." [*Id.*] The Court therefore denied Lynn's motion "without prejudice to his ability to file a properly supported motion for compassionate release after satisfying the prerequisites for such a motion." [*Id.* at 2.]

### C. Lynn's March 2020 Request to the Warden and His Current Motion

On March 12, 2020[1], the Warden of Lynn's facility received his request for compassionate release. [Doc. No. 82 at 33–45.] Lynn's request acknowledged that this Court had already denied his motion to reduce his sentence based on his medical conditions. [*Id.* at 36 n.1.] But, he said, this Court "denied without prejudice" his motion to reduce his sentence based on his age. [*Id.*] The cover letter to his new request stated that it was based on "BOP's 'Other Elderly Inmates' category," which was not based on medical circumstances but based on his age and the percentage of his sentence that he had already served. [*Id.* at 33.] Lynn's request enumerated the factors that BOP weighs in determining whether a reduction in sentence is appropriate and concluded that he was due to be released. [*Id.* at 38–43.]

In addition to claiming that he qualified under BOP's "Other Elderly Inmates" category, Lynn argued that he was eligible for a reduction in sentence because he met the criteria described in U.S.S.G. §1B1.13, application note 1(B). [*Id.* at 33, 36.] Specifically, Lynn's request said that he was over 65 years old, that the aging process had caused a serious

---

[1] Lynn's request is dated February 25, 2020. Though the difference is immaterial in this case, the operable date under 18 U.S.C. § 3582(c)(1)(A) is the date on which the Warden of the defendant's facility received the request. Here, that date is March 12, 2020. [Doc. No. 82 at 31.]

deterioration in his physical health, and that he had served the requisite time in prison. [*Id.* at 36–37, 43–45.]

Lynn's request did not reference or address COVID-19.

The Warden denied Lynn's request on May 4, 2020. [Exhibit A.] The Warden noted that Lynn requested "consideration under non-medical circumstances for the elderly inmates age 65 or over" who have served at least 75% of their sentence and concluded that Lynn "d[id] not meet the minimal criteria" for early release based on those circumstances. [*Id.* at 1.] The Warden also emphasized that they had to consider, among other things, the nature and circumstances of his offense, whether a reduction in sentence would "minimize the severity of the offense," and whether early release would pose a danger to the community. [*Id.*] In that vein, the Warden observed that Lynn was "the leader of an extensive, and well organized conspiracy to import and distribute massive quantities of cocaine." [*Id.*] Moreover, the Warden pointed out that Lynn had been a fugitive. [*Id.*] Given those factors, the Warden denied Lynn's request. [*Id.* at 1–2.] The Warden's decision did not expressly reject Lynn's alternative argument that he qualified for a reduction in sentence based on U.S.S.G. §1B1.13 app. note 1(B). [*Id.*]

Lynn mailed his current motion on May 1, 2020. [Doc. No. 82 at 136.] He argues that he is eligible for a reduced sentence "based on non-medical circumstances for elderly inmates who have served at least 75% of their sentence." [*Id.* at 3.]

Lynn specifically addresses this Court's jurisdiction to consider his motion. [*Id.* at 2.] He cites his March 2020 request to BOP, observes that 30 days had elapsed since the Warden's receipt of his request, and concludes that this Court has jurisdiction to consider his motion. [*Id.*]

Next, Lynn states that he is over 65 and has served over 75% of his sentence. [*Id.* at 4.]

Lynn also argues that he qualifies for a reduction in sentence because he has suffered "serious deterioration in physical or mental health due to the aging process" as required by U.S.S.G. §1B1.13 application note 1(B). [*Id.* at 5.] Lynn reiterates his prior description of his physical condition. He says that his physical health is seriously deteriorated based on his "chronic kidney failure," atrial fibrillation, high blood pressure, hyperlipidemia, gastroesophageal reflux disorder, enlarged prostate, cervical disc degeneration, and carpal tunnel syndrome "among other conditions," each of which he says "has intensified with age." [*Id.* at 4.] He then points to his "congenital heart disease" which had caused the three trips to the emergency room that he described in his prior motion. [*Id.*] In addition to the concerns raised in his previous motion, Lynn argues that his physical condition leaves him at a "high risk of severe illness or death" if he were to contract COVID-19. [*Id.* at 4–5.]

The remainder of Lynn's motion argues that, weighing the factors in 18 U.S.C. § 3553(a), his sentence should be reduced. [*Id.* at 6–14.]

In a supplemental filing, Lynn provides a declaration from a cardiologist, Dr. Alfred Seto, who had reviewed his medical records. [Doc. No. 85.[2]] He wrote that it "appear[ed]" that Mr. Lynn's coronary and renal disease were "more extensive and severe than other typical patients his age." [*Id.* at 7.] Dr. Seto concluded that Lynn "will likely need more stenting of his other vessels within 5 years and possibly a coronary artery bypass surgery within that same time frame." [*Id.*] Dr. Seto added that Lynn's sleep apnea should be expected to worsen and that his atrial fibrillation would "likely" recur. [*Id.*] Finally, Dr. Seto said that Lynn's "age, and the fact that he suffers from severe coronary disease and hypertension" meant that he "is at greater risk of severe illness or death if he were to contract COVID-19." [*Id.*]

## II.  Bureau of Prisons' Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, Bureau of Prisons ("BOP") has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-

---

[2] The United States does not object to the Court's consideration of Lynn's supplemental filing or dispute Dr. Seto's qualifications.

19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates

in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly-updated resource page: www.bop.gov/coronavirus/index.jsp. [*See also* Exhibit B (*Examining Best Practices for Incarceration and Detention During COVID-19: Hearing Before the Senate Comm. on the Judiciary* (June 2, 2020) (joint statement of BOP Director Carvajal and BOP Medical Director Dr. Allen)).]

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least

threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the CARES Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that so far have seen the greatest incidence of coronavirus transmission. *See* Exhibit C (Mem. for Director of Bureau of Prisons). Since March, BOP has placed an additional 3,690 inmates on home confinement, an increase of 129 percent. *See* bop.gov/coronavirus (last accessed on June 3, 2020).

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP

has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## III.  Lynn's Motion Should Be Dismissed

This Court should dismiss Lynn's motion for lack of jurisdiction.  It previously instructed Lynn that he could not "bypass the procedure established by Congress for seeking compassionate release" and make a new motion "based on new circumstances." [Doc. No. 81 at 1.]  The Court instructed, Lynn that he "must first seek relief through the Bureau of Prisons as described in 18 U.S.C. § 3582(c)(1)(A)." [*Id.*]

Despite this Court's instruction, Lynn did not satisfy the prerequisites of § 3582(c)(1)(A) before filing this motion.  It should be dismissed.

### A.  Applicable Legal Framework

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed,' 18 U.S.C. § 3582(c); but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  The defendant bears the burden to show eligibility for a modification of sentence.  18 U.S.C. § 3582(c)(1)(A); *see United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment.  Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf.

§ 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

BOP has issued regulations and a program statement governing requests to the Warden for compassionate release. To "request" compassionate release based on an extraordinary or compelling reason, a defendant "shall" provide certain "minimum" information. 28 C.F.R. § 571.61(a). The defendant must detail the extraordinary or compelling reasons that they believe justify release. 28 C.F.R. § 571.61(a)(1). In addition, the defendant must include "[p]roposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment." 28 C.F.R. § 571.61(a)(2).

After BOP receives a request for compassionate release, the agency conducts an extensive assessment of the request. Prior to approving a request for a reduced sentence, pursuant to agency policy and Department regulation, the BOP conducts a thorough evaluation of the circumstances underlying the request, including gathering and assessing

all pertinent institutional, medical, and other personal records. The review is conducted by the warden of the institution where the inmate is confined; the BOP General Counsel; the BOP Medical Director and/or the Assistant Director of the Correctional Programs Division, depending on the nature of the request; and ultimately the Director of the BOP. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. The General Counsel also solicits the opinion of the United States Attorney in the district in which the inmate was sentenced. 28 C.F.R. § 571.62(a)(2). Finally, where an inmate's term of imprisonment is to be followed by a period of supervised release, the agency contacts the United States Probation Office for the district to which the inmate would be released to ensure the proposed release plan required by 28 C.F.R. § 571.61(a)(2) is appropriate and the location to which the inmate would be released comports with the terms of the inmate's supervised release. *See* BOP Program Statement 5050.50 at 14.

BOP's extensive review serves to ensure that the defendant's request meets the requirements for compassionate release. Evidence collected during the review sheds light on whether the request reflects extraordinary and compelling circumstances; the inmate's early release would not unduly minimize the severity of the inmate's offense; and the inmate's early release would not unduly jeopardize public safety, which

16

are all factors that must be taken into account by the Court under Section 1B1.13 of the Sentencing Guidelines and the BOP program statement.

## B. This Court Lacks Jurisdiction to Consider Lynn's Motion

This Court does not have jurisdiction to consider Lynn's motion. As this Court aptly put it, Lynn cannot "bypass the procedure established by Congress for seeking compassionate release" and make a new motion "based on new circumstances." [Doc. No. 81 at 1.] His current motion is Lynn's latest attempt to do just that. Specifically, he cites the COVID-19 pandemic as the "new qualifications" for relief that did not exist at the time of his previous motion. [Doc. No. 82 at 1, 4–5.] But the basis he cites for this Court's jurisdiction is his request to BOP that did not raise pandemic-related concerns as a basis for a reduced sentence. [*Id.* at 2, 33–45.]

Lynn is incorrect that his earlier request to the Warden, which made no mention of the pandemic, satisfies the procedural requirements of § 3582 for the purposes of his current motion. As this Court has observed, a prior request to BOP based on one set of circumstances does not enable it to evaluate a motion for compassionate release based on a new set of circumstances. To find otherwise would be to "bypass the procedure established by Congress for seeking compassionate release." [Doc. No. 81 at 1.]

Accordingly, this Court recently concluded that it lacks authority to entertain a COVID-19-based motion for compassionate under these circumstances. *United States v. Gray*, 2020 WL 2132948 at *6 (S.D. Ala. May 4, 2020) (DuBose, C.J.). Gray submitted a request to the Warden of her facility citing medical conditions as the basis for her early release. *Id.* at *2. Before this Court, however, she added that "possible exposure" to the COVID-19 pandemic in combination with her medical condition was another basis for her early release. *Id.* at *6. The Court denied Gray's motion for compassionate release on its merits insofar as it raised the same facts and arguments included in her request to BOP. *Id.* at *4– *5. But it dismissed without prejudice Gray's new claim. *Id.* at *6. In doing so, the Court made clear that Gray could submit a new request to the Warden based on any changed circumstances and, if there were no answer after 30 days, file a new motion based on those circumstances. *Id.*

This Court is not alone in reaching the obvious conclusion that a defendant's motion for compassionate release in federal court must be based on the same evidence and arguments as the defendant's request to the Warden. After all, one of the purposes behind the procedural requirements of § 3582(c)(1)(A) "is to give the BOP an opportunity to address the issue." *United States v. Valenta*, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020). If the "evidence and arguments" underlying a defendant's motion were not "presented to the Bureau of Prisons first," the district court

is not empowered to review the new evidence and arguments. *United States v. Jenkins*, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020). Therefore, a defendant who has not "exhausted [their] administrative remedies regarding [their] complaint about COVID-19 . . . cannot properly bring [their] motion" to federal court. *United States v. Mollica*, 2020 WL 1914956 at *6 (N.D. Ala. April 20, 2020); *see also United States v. Rodriguez-Orejuela*, ___ F. Supp. 3d ___, 2020 WL 2050434 (S.D. Fla. April 28, 2020) (same); *United States v. Walls*, ___ F. Supp. 3d ___, 2020 WL 1934963 at *3 (E.D. Mich. April 22, 2020) (same); *United States v. Mogavero*, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020) (same).

Lynn's current motion, like his request to "reopen" his prior motion, is not properly before this court. As this Court wrote in that decision, "he must first seek relief through the Bureau of Prisons as described in 18 U.S.C. § 3582(c)(1)(A)." [Doc. No. 81 at 1.] Until then, "his motion is premature." [*Id.*]

This Court may not ignore the procedural requirements of § 3582(c)(1)(A) because those requirements are jurisdictional. Given the plain language and purpose of the statute, the requirements for filing a sentence-reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for a reduction—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the

power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (internal quotation marks omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67–69 (1914); *see also United States v. Welty*, 426 F.2d 615, 617–18 & n.8 (3d Cir. 1970). Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848–50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id*. at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson v.*

*Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that § 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for a sentence reduction where the defendant has failed to satisfy the requirements of § 3582(c)(1)(A).

While the United States maintains that the time limitation in § 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the requirements of § 3582(c)(1)(A) were not jurisdictional, they are at least mandatory claim-processing rules and must be enforced if a party "properly raise[s]" them. *Eberhart*, 546 U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule); *see United States v. Alam*, ___ F.3d ___, 2020 WL 2845694 at *2–*3 (6th Cir. June 2, 2020) (holding that § 3582's procedural requirements are mandatory claims-processing rules). The government raises the rule here, and it must be enforced.[3]

---

[3] Indeed, even those courts that have concluded that the requirements of § 3582(c)(2) are not jurisdictional still enforce the statutory

This Court cannot ignore the requirements of § 3582(c)(1)(A) because of the current public health emergency. While judicially-created exhaustion requirements may sometimes be excused, it is well settled that a court may not ignore a statutory command such as that presented in § 3582(c)(1)(A). *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("[w]here Congress specifically mandates, exhaustion is required"). The Supreme Court recently reaffirmed that principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which it rejected a judicially created "special circumstances" exception to a statutory exhaustion requirement. Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances. *Id.* at 1856.

Section 3582(c)(1)(A)'s requirements cannot be ignored as "futile," either. *See Alam*, 2020 WL 2845694 at *4. There is no "futility" exception, as the Supreme Court has made clear that courts have no authority

---

prerequisites to relief. *See, e.g.*, *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (recognizing that even if a court has the "power to adjudicate" a motion under § 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

to invent an exception to a statutory exhaustion requirement. Two district courts have recently rejected the argument that any such futility exception exists under § 3582. *See United States v. Holden*, 2020 WL 1673440, at *5 (D. Or. Apr. 6, 2020); *United States v. Eberhart*, 2020 WL 1450745, at *1 (N.D. Cal. Mar. 25, 2020). While a few district courts have incorrectly excused the § 3582 exhaustion requirement as futile, two of those decisions have rested on the fact that the defendant had a matter of days left to serve on the sentence, a consideration not present in this case. *See United States v. Colvin*, 2020 WL 1613943, at *1 (D. Conn. Apr. 2, 2020) (finding exhaustion futile because inmate had 11 days left on her sentence); *United States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (finding exhaustion futile because inmate had less than 21 days left on his sentence and was recovering from two vicious beatings while in prison); *but see United States v. Zukerman*, 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) (finding exhaustion futile where obese, 75-year old inmate suffered from diabetes and hypertension). At least one of those decisions incorrectly relied on precedent addressing a judicially created—as opposed to statutorily created—exhaustion requirement. *See Perez*, 2020 WL 1546422 at *2 (relying only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)).[4] And in any event, a request in this context

---

[4] To the extent *Perez* also suggests that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supports an exception to the exhaustion requirement here, *see* 2020 WL 1546422, at *2 n.2, that is incorrect. In *Eldridge*, the claimant complied with the "nonwaivable and nonexcusable requirement

is not futile. As the procedural history of Lynn's case demonstrates, BOP fully considers requests for sentence reductions. Indeed, BOP often concurs with such requests. During the period from the passage of the First Step Act on December 21, 2018, until mid-March 2020 (before the coronavirus crisis began), BOP consented to a reduction in sentence in 55 cases.

While Congress has allowed inmates to seek compassionate release directly, it expressly imposed on inmates the requirement of initial resort to administrative remedies. And this is for good reason: as described above in more detail, BOP conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50. As the Procedures reflect, the BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

That is especially true during the current crisis. As explained above, BOP must balance a host of considerations in deciding whether to

that an individual present a claim to the agency before raising it in court." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 16 (2000). And while the Court in *Eldridge* recognized that a constitutional challenge "entirely collateral to [the claimant's] substantive claim of entitlement" might evade a statutory exhaustion requirement, 424 U.S. at 330, the defendant's claim for relief in this Court is the same claim he was required to present to BOP. *See also United States v. Demaria*, 2020 WL 1888910, at *3 & n.8 (S.D.N.Y. Apr. 16, 2020) (explaining the *Perez* error at length and the inapplicability of the cases on which it relied).

release an inmate to recommend a reduction in an inmate's sentence or grant the inmate home confinement—not only the health of the inmate and BOP staff, but also the safety of the public. BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations in light of on an inmate's background and medical history and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. Apr. 2, 2020), *as revised* (Apr. 8, 2020); *see also United States v. McCann,* 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) ("The Court recognizes that these are unsettling times for everyone, including prisoners. But in such a context, the exhaustion requirement of the compassionate release statute is perhaps most important.").

Accordingly, Lynn's motion should be denied without prejudice to refiling once he has exhausted his administrative remedies.

## IV. Alternatively, Lynn's Motion Should Be Denied

Even if this Court had jurisdiction to consider Lynn's motion for a reduction of his sentence, his motion should be denied. First, he is not

eligible for a reduction in sentence under the "Age of the Defendant" provision, U.S.S.G. §1B1.13 app. note 1(B). This Court previously found that Lynn's medical conditions did not substantially diminish his ability to care for himself while incarcerated. The COVID-19 pandemic does not change this Court's conclusion, so it should find that Lynn is not eligible for a reduced sentence under that subsection.

Second, Lynn is not eligible for a reduction in sentence under the "Other Reasons" provision, U.S.S.G. §1B1.13 app. note 1(D). As this Court previously observed, and as many other courts have also concluded, Congress' decision to allow defendants to file motions for compassionate release did not expand the scope of the Sentencing Commission's policy statement outlining the criteria for evaluating such motions.

### A.    Applicable Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), a court may reduce a defendant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). That section also requires that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). In turn, 28 U.S.C. § 994(t) directs the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."

The Sentencing Commission's policy statement on "extraordinary and compelling" reasons for a sentence reduction appears at U.S.S.G. §1B1.13. In an application note, the Sentencing Commission provides several definitions of the term "extraordinary and compelling reasons," such as a defendant's medical conditions or family circumstances. U.S.S.G. §1B1.13 app. note 1. One of the Sentencing Commission's definitions is entitled "Age of the Defendant" and specifies that an "extraordinary and compelling" reason for a reduction in sentence exists if a defendant "(i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. §1B1.13 app. note 1(B). When BOP considers a defendant's request under that section, it considers both whether they are suffering "from chronic or serious medical conditions related to the aging process" as well as whether their conditions "substantially diminish[ ] their ability to function in a correctional facility." BOP Program Statement 5050.50 at 6.[5]

The last entry of the Sentencing Commission's application note is entitled "Other Reasons" and provides that the Director of BOP may determine whether "there exists in the defendant's case an extraordinary

---

[5] BOP's program statement is "akin to an interpretive rule." *Reno v. Koray*, 515 U.S. 50, 60–61 (1995). While not binding on this Court, it is "entitled to some deference" because it is a "permissible construction" of § 3582(c)(1)(A). *Koray*, 515 U.S. at 61.

and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. §1B1.13 app. note 1(D). As is relevant here, BOP has determined that a category of "Other Elderly Inmates" may qualify for a reduction in sentence. BOP Program Statement 5050.50 at 6–7. Unlike the provisions that take a defendant's medical or family circumstances into account, BOP instructs that defendants who are "age 65 or older who have served the greater of 10 years or 75% of their sentence" may qualify for a reduction. *Id.* at 6–7. Specifically, the Warden may determine that compassionate release is warranted for those defendants after also considering a host of other, non-exclusive factors. *Id.* at 7, 12. Those factors include the defendant's age, the nature and circumstances of their offense, their criminal history, and whether their release would pose a danger to the community. *Id.* at 12.

Notably, the Sentencing Commission's policy statement and its application notes are binding on this Court. *Dillon v. United States*, 560 U.S. 817, 826 (2010) (holding that Commission's policy statements bind the Court where a statute authorizes a sentencing reduction based on a retroactive guideline amendment only "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"); *United States v. Wilks*, 464 F.3d 1240, 1245 (11th Cir. 2006) (Sentencing Commission's application notes are binding unless they contradict the plain meaning of the Guidelines' text). Notably, too, this

Court has previously concluded that the Sentencing Commission's "Other Reasons" provision does not enable federal courts to craft its own definitions of the term "extraordinary and compelling." *Lynn*, 2019 WL 3805349 at *2–*4.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into the categories identified in the Sentencing Commission's application note and therefore cannot alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597; *see also Eberhart*, 2020 WL 1450745 at *2 ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)").

To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home

confinement.  Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A).  For example, if a defendant's motion is based on their medical condition and proves that they have a chronic medical condition that has been identified by the Centers for Disease Control and Prevention ("CDC") as elevating the inmate's risk of becoming seriously ill from COVID-19,[6] that condition may satisfy the standard of "extraordinary and compelling reasons."  Under those circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[ ] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19.  U.S.S.G. §1B1.13, app. note 1(A)(ii)(I).  But as part of its analysis of the totality of circumstances, the Court should also consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated.  That will

---

[6] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed May 14, 2020).

typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution.

But COVID-19 is not relevant to every request for compassionate release. For example, when a defendant moves for compassionate release solely based on a "reason other than" those defined by the Sentencing Commission, BOP's determination about whether "extraordinary and compelling" remains governing.

## B. Lynn Is Not Eligible For A Reduction In Sentence

### 1. The "Age of the Defendant" Provision

Lynn argues that he is eligible for a reduction in sentence under the "Age of the Defendant" provision. [Doc. No. 82 at 3 (quoting U.S.S.G. §1B1.13 app. note 1(B)).] He is not.

To be eligible for a reduction in sentence under U.S.S.G. §1B1.13 app. note 1(B), a defendant must be over 65 years old, be experiencing a serious deterioration in physical or mental health because of the aging process, and have served at least 10 years or 75 percent of his sentence, whichever is less. U.S.S.G. §1B1.13 app. note 1(B).

Interpreting the statutory term "extraordinary and compelling circumstances," BOP's program statement adds necessary guidance. It provides that, in addition to experiencing a serious deterioration in physical or mental health because of the aging process, a defendant seeking a reduced sentence must also demonstrate that their medical condition

"substantially diminishes their ability to function in a correctional facility." BOP Program Statement 5050.50 at 6.

BOP's guidance makes sense: it would not be "extraordinary and compelling" for an aging defendant to develop health issues related to the aging process. 18 U.S.C. § 3582(c)(1)(A)(i). Indeed, the Sentencing Commission's application note requires that a defendant experience a "*serious*" deterioration of physical or mental health as a result of the aging process. U.S.S.G. §1B1.13 app. note 1(B). BOP's metric, which asks whether the defendant's condition "diminishes their ability to function in a correctional facility," is a permissible construction of the statutory term and should be given deference. *Koray*, 515 U.S. at 61; *see United States v. Rodriguez-Orejuela*, ___ F. Supp. 3d ___, 2020 WL 2050434 at *5 (S.D. Fla. April 28, 2020) (applying the test in BOP policy statement); *United States v. Hardy*, 2020 WL 2041666 at *4 (D. Md. April 28, 2020) (same); *United States v. Bellamy*, 2019 WL 3340699 at *4–*5 (D. Minn. July 25, 2019) (same).

To show eligibility for a reduced sentence under the "Age of the Defendant" provision, then, Lynn must show (1) that he is suffering from a serious deterioration in physical or mental health, (2) that his condition is due to "the aging process," and (3) that his condition substantially diminishes his ability to function in a correctional facility. Lynn has not made that showing.

First, Lynn says that he meets the criteria because of his medical conditions. He identifies the same conditions that he described in his prior motion for a reduced sentence, principally "chronic kidney failure," atrial fibrillation, and "congenital heart disease." [Doc. No. 82 at 4; *see* Doc. No. 70 at 2–3 (describing Lynn's motion).] This Court previously found that those conditions did not substantially diminish his ability to care for himself in a prison setting. [Doc. No. 70 at 4.] Indeed, it noted that the assistant warden of Lynn's facility found that he was "able to independently attend to [his] activities of daily living" and that his "condition does not affect [his] ability to function in a correctional setting." [*Id.*] This Court perceived no evidence to contradict the assistant warden's assessment. [*Id.*]

This Court's prior conclusion that Lynn's medical conditions did not prevent him from caring for himself while incarcerated remains correct. The United States has filed Lynn's recent medical records, current through May 22, 2020, under seal. Those records do not reveal a deterioration of Lynn's condition. Similarly, Dr. Seto's declaration does not speak to any change in Lynn's condition between the Court's resolution of Lynn's prior motion and today. [Doc. No. 85 at 7.] While Dr. Seto opines that Lynn will likely require additional care as a result of his heart and kidney disease [*id.*], Lynn's medical records demonstrate that he continues to receive the necessary medical attention while incarcerated.

The threat posed by the COVID-19 pandemic does not change the analysis. As already noted, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."[7] *Raia*, 954 F.3d at 597.

Moreover, Lynn has not demonstrated how the threat posed by the pandemic would seriously diminish his ability to function in a correctional facility. The CDC has warned that older individuals and people with serious heart or kidney disease are at higher risk of for severe illness if they contract COVID-19. *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed May 14, 2020). The CDC's recommended "actions to take" for the elderly, as well as those with serious heart or kidney disease, is to continue to receive consistent treatment for their medical conditions. *Id.* The records filed under seal show that Lynn is continuing to receive treatment from medical professionals on a roughly monthly basis.

In sum, Lynn's medical conditions, in conjunction with the threat posed by the COVID-19 pandemic, do not qualify him for a sentence reduction under the "Age of the Defendant" provision.

---

[7] As of the date of this response, BOP reports that one inmate at Lynn's facility, Coleman II USP, has tested positive for COVID-19 and one staff member has recovered from COVID-19. *See* bop.gov/coronavirus.

## 2. The "Other Reasons" Provision

Lynn also argues that he qualifies for a reduction in sentence "based on non-medical circumstances for elderly inmates who have served at least 75% of their sentence." [Doc. No. 82 at 1, 3, 5–6.] The source of authority for a reduction in sentence on that basis is the "Other Reasons" provision of U.S.S.G §1B1.13 app. note 1(D). That provision empowers the Director of BOP to "determine[ ]" that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," the other provisions of the application note. In Lynn's case, the Director of BOP has not made such a determination, so he is not eligible for a reduced sentence on that basis.

This Court has already concluded, in Lynn's own case, that the First Step Act did not expand the Sentencing Commission's policy statement to include new, judicially-created extraordinary and compelling reasons upon which to base a reduction in sentence. *See United States v. Lynn*, 2019 WL 3805349 at *2–*4 (S.D. Ala. August 13, 2019) (Steele, J.). To begin with, the First Step Act did not alter the statutory criteria for reducing a sentence for "extraordinary and compelling reasons." *Id.* at *2. Neither did it alter Congress' decision to delegate the authority to define the term "extraordinary and compelling reasons" to the Sentencing Commission. *Id.* at *3 (citing 18 U.S.C. § 944(t)). And, of course, the Sentencing Commission's policy statement remains the same. *Id.* While the Sentencing Commission might amend the "Other Reasons" provision

of its policy statement in the future, "the Court must follow the policy statement as it stands." *Id.* at *4.

Many other courts have agreed with this Court's assessment. *See, e.g.*, *United States v. Baye*, 2020 WL 2857500 at *9 (D. Nev. June 2, 2020); *United States v. Coffman*, 2020 WL 2614634 at *2–*3 (E.D. Ky. May 22, 2020); *United States v. Garcia*, 2020 WL 2039227 at *3–*4 (C.D. Ill. April 28, 2020); *United States v. Winner*, ___ F. Supp. 3d ___, 2020 WL 2124594 at *2 (S.D. Ga. April 24, 2020); *United States v. Strain*, 2020 WL 1977114 at *3–*4 (D. Alaska April 24, 2020); *United States v. Mollica*, 2020 WL 1914956 at *4 (N.D. Ala. April 20, 2020); *United States v. Goldberg*, 2020 WL 1853298 at *4 (D.D.C. April 13, 2020); *United States v. Willingham*, 2019 WL 6733028 at *2 (S.D. Ga. Dec. 10, 2019).

Nevertheless, Lynn contends that a "majority of courts have found" that they are "not limited to the strict definitions" provided by the Sentencing Commission. [Doc. No. 82 at 5 n.12.] While the undersigned has not endeavored to tally up the number of cases on either side, there is no dispute that there is currently a nation-wide debate on the topic.

In short, the courts articulating the contrary position say that the First Step Act's purpose was to "increase the use and transparency of compassionate release." *United States v. Maumau*, 2020 WL 806121 at *3–*4 (D. Utah February 18, 2020) (quoting *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019)). And, those courts conclude, finding that courts were bound by an "old policy statement" would be

"inconsistent" with that purpose. *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019).

But, as this Court pointed out, the policy statement is not inconsistent with the First Step Act. To the extent that the Act's purpose is to expand the "use" of the compassionate release provision, it accomplishes that goal by expanding access to federal courts. *See Lynn*, 2019 WL 3805349 at *3. Thus, there is "no tension between a legislative purpose to 'increase[e] the use' of compassionate release and a policy statement providing for BOP to make the determination as to one kind (out of five) of extraordinary and compelling reasons for such release." *Id.*

As long as the current policy statement remains in effect, the "Other Reasons" provision requires that the Director of BOP—not a federal court—find that there is some other extraordinary and compelling reason for a reduction in a defendant's sentence. The Director of BOP has not made that finding in Lynn's case, so he is not eligible for compassionate release on that basis.

## C.    Lynn's Sentence Should Not Be Reduced

Ultimately, even if Lynn were eligible for a reduction in sentence, his motion should still be denied. If a defendant carries their burden to show an extraordinary and compelling reason to warrant a sentence reduction under § 3582(c)(1)(A), this Court would then consider the

sentencing factors in 18 U.S.C. § 3553(a) when deciding whether to exercise its discretion to grant their motion. 18 U.S.C. § 3582(c)(1)(A). Weighing those factors, a reduction is not due.

The nature and circumstances of Lynn's offense are extraordinary. Over the course of several years, Lynn successfully led a conspiracy that imported thousands of kilograms of cocaine in to the United States. *Lynn*, 365 F.3d at 1227. Ultimately, the Court found that his crimes had involved "13,200 kilograms of cocaine." *Id.* at 1227 n.3. For that extraordinary course of conduct, this Court imposed a life sentence. That sentence remains fair and appropriate.

In support of a shorter sentence, Lynn submits that he began smuggling drugs at age 19 because he had "no direction for his life" and because a friend's father "convinced" him to enter the trade. Doc. No. 82 at 8.] By age 34, though, Lynn's life had a firm direction: importing massive amounts of cocaine into the United States. And as the leader of the conspiracy that included armed "intimidat[ors]," Lynn was the one doing the convincing. *See Lynn*, 365 F.3d at 1227.

Next, Lynn characterizes his offenses as "nonviolent." [Doc. No. 82 at 2, 6, 7, 12.] But at sentencing, the Court increased his offense level by two levels for possession of a firearm. *Lynn*, 365 F.3d at 1227 n.3. Lynn's codefendant was the "armed 'enforcer' who provided intimidation." *Id.* at 1227. Whether or not the evidence at Lynn's trial proved the use of violence by Lynn himself, his current incantation of the term "nonviolent" is

a gross mischaracterization of the nature of the conspiracy that he led and of the obvious consequences of fueling the United States' drug economy.

Lynn also says that he has an "exceptional record" while in prison. [Doc. No. 82 at 5, 6, 9, 14.] He admits as he must however, that he escaped from prison—"briefly," he says—in 1990. [*Id.* at 9.] Lynn's "brief" escape lasted for about six months, during which time he attempted to continue to import cocaine into the United States. [*Id.*] Not to be deterred, Lynn attempted to escape only two years later. [*Id.*] Having not succeeded in escaping this Court's authority, Lynn now "greatly regrets" his efforts. [*Id.*]

Finally, Lynn attaches numerous letters in support of the conclusions that he has served an adequate sentence, that he has a reentry plan, and that his community is eager for his return. [*See id.* at 46–55, 83–101.] The United States does not dispute the existence of Lynn's reentry plan or his community's enthusiasm. However, the United States respectfully submits that the letter writers now view Lynn's serious crimes through rose-colored glasses, perhaps due to their apparent affection for the defendant. This Court should not adopt their rosy retrospection: Lynn was the leader of an armed conspiracy that imported tons—and tons—of cocaine into the United States. He is currently serving the appropriate sentence for that conduct.

## V.    Conclusion

This Court lacks jurisdiction over Lynn's motion, so it should be dismissed.  Alternatively, Lynn's motion should be denied because he has not shown eligibility for a reduced sentence and because his sentence remains fair and appropriate.

Respectfully submitted,

RICHARD W. MOORE
UNITED STATES ATTORNEY
By:

*/s/ Oliver McDonald*
Oliver McDonald
Assistant United States Attorney
63 South Royal Street, Suite 600
Mobile, Alabama 36602
Telephone: (251) 441-5845
Fax: (251) 441-5277

## CERTIFICATE OF SERVICE

I certify that, on June 4, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically serve any counsel of record.  Further, a copy of the foregoing was mailed on this date to: Richard Lynn, No. 09748-004, USP Coleman II, P.O. Box 1034, Coleman, Florida  33521.

*/s/ Oliver McDonald*
Oliver McDonald
Assistant United States Attorney

# EXHIBIT  A

**FCC Coleman**
Response to Inmate Request to Staff

Inmate: Lynn, Richard
Reg. No.: 09748-004
Institution / Housing Unit: CLP / H-2

This is in response to your Inmate Request to Staff, wherein you
requested a compassionate release under Program Statement 5050.50
titled Compassionate Release/Reduction in Sentence: Procedures for
Implementation of 18 U.S.C. §§ 3582 (c)(1)(A). Specifically, you
are requesting consideration under non-medical circumstances for
the elderly inmates age 65 or older who have served the greater of
10 years or 75% of the term of imprisonment to which the inmate was
sentenced.

A thorough review of your request was completed. Utilizing Program
Statement 5050.50, Compassionate Release/Reduction in Sentence:
Procedures for Implementation of 18 U.S.C §§ 3582 dated January 17,
2019, you do not meet the minimal criteria to be considered for
Non-Medical Circumstances- Elderly Inmates-Other. Section 7 of
Program Statement 5050.50, Compassionate Release/Reduction in
Sentence further explains that in all RIS cases, consideration should
be given to factors such as the nature and circumstances of the
inmate's offenses, the inmate's criminal history, the inmate's
institutional adjustment, whether release would minimize the
severity of the offense to which sentenced and whether release would
pose a danger to the safety of any other person or the community.

A review of documentation reflects you are 65 years old and have
served over 30 years of a Life Sentence. A review of your current
offense reveals, in addition to Conspiracy to Import Schedule II
Controlled Substance (Cocaine); Conspiracy to Possess with the Intent
to Distribute and to Distribute Cocaine and Marijuana; you were the
leader of an extensive, and well organized conspiracy to import and
distribute massive quantities of cocaine. Additionally, you were
a fugitive from March 1990 until your capture in August 1990.  These
factors were considered neither exclusive nor weighted in relation
to your compelling circumstances. Rather, they were utilized to
determine a reduction in sentence would minimize the severity of
your offense.

After careful review of this information, consideration for Compassionate Release/ Reduction in Sentence is denied. In compliance with Bureau of Prisons Program Statement 5050.50, titled Compassionate Release/Reduction in Sentence, you may appeal this denial through the Administrative Remedy Program if you are unsatisfied with this response.


C. Swain, Warden                    5/4/2020
                                    Date

EXHIBIT  B

![Department of Justice seal]

# Department of Justice

---

STATEMENT OF

**MICHAEL D. CARVAJAL**
**DIRECTOR**
**AND**
**DR. JEFFERY ALLEN**
**MEDICAL DIRECTOR**
**FEDERAL BUREAU OF PRISONS**

BEFORE THE

**COMMITTEE ON THE JUDICIARY**
**UNITED STATES SENATE**

FOR A HEARING ON
**EXAMINING BEST PRACTICES FOR INCARCERATION**
**AND DETENTION DURING COVID-19**

PRESENTED
**JUNE 2, 2020**

**Statement of Michael D. Carvajal**
**Director, Federal Bureau of Prisons**
**And**
**Dr. Jeffery Allen**
**Medical Director, Federal Bureau of Prisons**
**Before the Committee on the Judiciary**
**United States Senate**
**June 2, 2020**

Good morning, Chairman Graham, Ranking Member Feinstein, and Members of the Committee. You have asked me to come before you today to discuss the Bureau of Prisons' (Bureau's) mission and operations in response to the COVID-19 pandemic that is impacting our country, and indeed, the world. The Bureau's response and management of COVID has received a great deal of Congressional, media, and stakeholder interest and scrutiny in the wake of this pandemic. Much of this inquiry has been based on misinformation as to our response. We appreciate this opportunity to discuss in person all that we have been doing to reduce risks and mitigate the impacts of the pandemic, and to keep our staff, inmates, and communities safe.

I was honored to be selected by Attorney General Barr to lead the Bureau and to work alongside the finest corrections professionals in the world. I have spent 28 years in the Bureau, starting as a Correctional Officer, moving up through the ranks of Correctional Services to become a Warden, Regional Director, and now Director. I was appointed to serve as the Bureau's eleventh Director on February 25, 2020, just about four weeks before the Bureau's first inmate COVID-19 positive case. In these past three months, I have seen the Bureau's over 36,000 corrections professionals work tirelessly and with profound dedication toward their mission to protect the health and safety of inmates, fellow staff and the public. I am keenly aware of the personal sacrifices these law enforcement officers make in fulfilling our important public safety mission. The great work they do every day goes largely unseen by the general public. Yet this inherently dangerous work helps keep our communities safe. Many communities have been very supportive and appreciative of the difficult challenges our law enforcement personnel face and overcome even in the absence of this public health crisis. Some communities support and applaud our staff as frontline heroes, and other communities have treated these brave staff and fellow citizens in a far less courteous manner, sometimes even accusatory or hostile. Those latter reactions, albeit rare, are disappointing, and unwarranted.

The Bureau has a sound pandemic plan in place and a well-established history of managing and responding to communicable disease outbreaks, such as influenza. We used this pandemic plan as a springboard for our COVID-19 response planning beginning in January, when our medical leadership began consulting with relevant experts, including the Centers for Disease Control and Prevention (CDC), the U.S. Public Health Service, the Office of Personnel Management (OPM), and the Office of the Vice President. We leveraged and implemented guidance from these experts and used it in developing protocols for screening inmates and staff with potential exposure risk factors. We have continued this strong collaboration, with our Medical Director and staff consulting on an almost daily basis with the CDC to ensure we are implementing best practices based on science and sound judgment, as the knowledge about and

response to the pandemic continues to evolve.  We have invited the CDC into our facilities and had them evaluate our work, which has been met with praise for our planning and implementation in the wake of a very vexing virus.  We continue to collaborate with the CDC in providing information to assist them in developing additional guidance for corrections professionals nationwide.

In order to be transparent about our plans, operations, and statistics, the Bureau has put together a detailed and thorough COVID-19 pandemic resource area on our public website at www.bop.gov/coronavirus.  The website is updated daily at 3 pm with our latest information as reported by the BOP's Office of Occupational Health and Safety.  In addition, the Bureau provides a weekly telephonic briefing for staff from the United States Senate and U.S. House of Representatives Judiciary and Appropriations Committees.

## CURRENT STATUS

The Bureau manages the health and treatment of approximately 149,000 inmates in BOP facilities and RRCs.  Over half of our institutions have no COVID-19 positive cases among inmates or staff.  Indeed, two-thirds of our positive cases are in just 7 of our 122 institutions nationwide.  As of June 1, 2020, across all facilities, there are 1,650 federal inmates who are currently COVID-19 positive based on test results. There are also currently 171 Bureau staff who have confirmed positive test results for COVID-19 nationwide, with 445 staff recovered and returning to work.

In total, from March 1, 2020, the date of the beginning of the national emergency proclaimed by President Trump, until today, 5,323 inmates total have tested positive for COVID-19 and to-date, 3,784 have recovered.  More than 80 percent of infected individuals have not become significantly ill.  The number of hospitalized inmates – those who became significantly ill – is currently only 83 in total.  And in fact, the number hospitalized is on a significant downward trajectory (see attached), suggesting that our attempts to mitigate the transmission of the virus is effective.  Regrettably, there have been 68 federal inmate deaths from COVID-19.

To-date, the Bureau's overall infection rate is approximately 4%, including clinically-probable and suspect cases, and based on the total number of inmates in custody.  The BOP's death rate of those infected is approximately 1.1% and is slightly lower than the US rate of 1.3%.  The BOP's rate of hospitalization has continued to decline over time with only 83 inmates currently hospitalized and only 22 of those on ventilators.

## PANDEMIC PLANNING

In response to the COVID-19 pandemic, the Bureau has taken, and will continue to take, aggressive steps to protect the safety and security of all staff and inmates, as well as members of the public.  Using the Incident Command System (ICS) framework, the Bureau developed, implemented, and updated an incident action plan that addresses our modified institution operations, Continuity of Operations Program, information technology readiness, supply management, inmate movement, inmate visitation, and official staff travel, as well as other important aspects of our operations.  In addition to the modifications we have already

undertaken, we continue to find innovative ways to continue to provide inmate programming to assist them with reentry.

The Bureau has also provided on an on-going basis detailed information about COVID-19 based on CDC guidance to inmates and staff on symptoms, transmission, preventative measures, and importance of reporting any potential symptoms to Health Services staff. We have an internal web-based system for tracking and monitoring infectious diseases and outbreaks, which leverages data from Bureau operational systems and facilitates the management of active cases for health care and correctional professionals system-wide. In all of our guidance, one simple preventative measure we have stressed is practicing good hygiene, as basic hygiene practices can be very effective in reducing the spread of germs. In addition, despite random reports of shortages, all institutions have ample cleaning products, disinfectant, and soap available and may procure additional supplies from a regional or national stockpile.

## PERSONAL PROTECTIVE EQUIPMENT

Initially, the Bureau was facing the same personal protective equipment (PPE) supply chain challenges as the rest of the country. We had appropriate amounts of PPE in our inventories, but we were concerned we would not be able to obtain additional needed supplies going forward as existing inventories dwindled. However, through scouring of available markets and use of emergency purchasing authorities, the Bureau successfully acquired a sizable stockpile of PPE. Each institution maintains a detailed inventory of PPE which is also monitored by our Emergency Operations Center in headquarters, to include N95 respirators, surgical masks, cloth face coverings, goggles/face shields, gloves, gowns, hand sanitizer, and cleaning supplies. In addition, each of our six regions maintains a regional stockpile, where items can be drop-shipped in one day to an institution that needs additional PPE. Note that initial CDC guidance was that face coverings were not recommended as a general measure. As the science evolved as to how the disease is transmitted, the CDC changed their guidance to recommend wearing face coverings. Within 24 hours of that change, we had provided face coverings to most of our staff and inmates. Within 72 hours, all of our inmates and staff were provided face coverings. To further augment our supplies, and consistent with the request of some congressional members, 15 Federal Prison Industries (FPI) factories were converted to PPE production for cloth face coverings, gowns, face shields, and hand sanitizer, allowing us to be more self-sustaining in production areas rather than burdening the public supply chain.

## INSTITUTION OPERATIONS

On March 13, 2020, in response to an increasing number of people with COVID-19 positive infections in various communities, the Bureau implemented an action plan to significantly limit movement in and out of our federal prisons. Almost all inmate internal — or Bureau-controlled — movement was suspended. There was some very limited inmate movement that was required, to include movements for forensic studies, writs, Interstate Agreements on Detainers, medical and mental health treatment, and transfer to RRCs or home confinement. New admissions to the Bureau from the USMS continued, as legally required. While we received criticism for that continued movement, it is critical to note that the criminal justice system did not stop processing criminal cases during the pandemic. Individuals in the community continue to commit crimes, arrests continue to be made, federal courts continue to

adjudicate and sentence offenders, and thus detainees and sentenced inmates continue to enter our system. We are legally required to take these individuals from the Courts, and cannot control who the courts place into our system. Some of these inmates are housed in Bureau detention facilities and jail units prior to sentencing, but the vast majority of them come to us from local jails or as voluntary surrenders. Working with the Department of Justice, we attempted to slow the entrance of some of these new admissions until additional testing capability was acquired.

As a critical part of our plan to mitigate the transmission of COVID-19 throughout its facilities nationwide, the Bureau, in coordination with the U.S. Marshals Service (USMS), has decreased internal movement by 90%. This action, along with the Bureau's implementation of a robust quarantine and isolation strategy for all new arrivals, was a bold and important short-term step to ensure the Department of Justice is protecting the health of the public, the staff, and the inmates in our custody to the greatest extent possible.

With the March 13 guidance, we also put in place, to the greatest extent possible within the prison environment, social distancing procedures. As is widely noted, prisons are not designed for social distancing. In fact, they are designed for just the opposite. Nonetheless, we modified our operations to the extent we could to minimize co-mingling and group gathering. We suspended social visiting as well, to decrease the flow of individuals from the community into the prison. Understanding the importance of visitation to the inmate population, we significantly increased telephone minutes for the inmates from 200 to 500 minutes on March 13, 2020, and later, on April 8, 2020, in accordance with the CARES Act, we made telephone calls free for the inmate population. We also made video-visiting, which we have available at our female facilities, free of charge. The free telephone calls were clearly appreciated by the inmate population, as telephone minutes increased by nearly 50% the next day. We are currently finalizing a regulation to formalize this program.

On March 26, 2020, we implemented enhanced daily monitoring, to include the cessation of movement for any inmate who screened positive for COVID-19. On March 31, 2020, enhanced modified operations were introduced to further limit movement within the institution and enable maximizing social distancing while still allowing inmates access to critical resources, to include eating meals in their rooms or cells or in small groups within housing units, and limiting programmatic offerings to individualized or small group activities, and having Chaplains and Psychologists visit inmates in their housing areas. We instituted requirements on April 7, 2020 for all inmates releasing from the Bureau or transferring to a RRC or Home Confinement to be placed on 14-day quarantine prior to their anticipated release or transfer. These procedures remain in place to promote public safety.

As I noted above, throughout this pandemic the federal courts have continued to remand pre-trial detainees to federal custody nationwide and to sentence inmates who are in our detention sites to terms of federal incarceration. As individuals continue to be remanded to Bureau detention sites, that capacity quickly fills. To ensure those facilities do not become dangerously overcrowded – a situation that is not only a health risk but also creates safety and security risks - some limited inmate movement must continue. As such, the Bureau and USMS will have to resume limited movement of inmates in order to appropriately manage the population within detention facilities to reduce risk. Since ceasing most movement, there have

been 6,800 USMS inmates in state and local jails that require movement into the Bureau and another 7,000 inmates currently in Bureau custody who are pending regular movement to their designated facilities.

Effective May 18, 2020, the Bureau and the USMS began coordinating carefully to transport and transfer federal inmates into the Bureau's custody while taking proactive steps, including aggressive testing, to mitigate the transmission of COVID-19 into our environment. The Bureau is testing all inmates upon arrival to our detention facilities, jail units, and quarantine/testing sites. Furthermore, all inmates are tested prior to departing these facilities to ensure inmates are safely transported to their designated facilities. As a second precaution, the Bureau will temporarily house all incoming inmates in one of three quarantine sites: FCC Yazoo City, Mississippi; FCC Victorville, California; and Federal Transfer Center, Oklahoma City, Oklahoma. These inmates are tested again before moving to their final Bureau designated facility.

Further, regardless of COVID-19 planning and protocol, emergencies have and will continue to arise that require us to adapt changes to our procedures. For example, in the midst of the diligent work Bureau staff were undertaking nationwide to counter the pandemic, on April 13, 2020, Federal Correctional Institution (FCI) Estill, South Carolina was struck by a tornado causing extensive damage to both the medium and minimum security institutions. Despite the damage to the facilities, only five inmates sustained very minor injuries. Over the ensuing four days, we were able to safely and securely move 842 inmates, relocating them to a prison in Pennsylvania that had available capacity. We have plans in place to deal with situations such as these, and even with the complexities that the COVID-19 pandemic adds to the execution of those plans, the experience of FCI Estill on April 13 reflects just how well-trained and prepared our staff and leadership are to handle whatever the next crisis may be.

## HOME CONFINEMENT

As the pandemic grew more widespread, the Bureau began aggressively screening the inmate population for inmates who were appropriate for transfer to RRC or Home Confinement for service of the remainder of their sentences. On March 26, 2020 and April 3, 2020, Attorney General Barr issued memoranda to the Bureau directing us to increase the use of Home Confinement, particularly at institutions that were markedly affected by COVID-19, for vulnerable inmates. The CARES Act, signed by President Trump on March 27, 2020, further expanded our ability to place inmates on Home Confinement by lifting the statutory limitations contained in Title 18 U.S.C. § 3624(c)(2) during the course of the pandemic. I am pleased to note that we currently have 6,120 inmates in RRC and 6,398 on Home Confinement. This is an 124% increase in HC from March 26, 2020. There are an additional 985 who are scheduled to transfer to Home Confinement in the coming weeks. While we continue to make robust strides in these placements to reduce risk of spread to the inmate population and staff, public health and safety must remain our highest priority. The Attorney General has issued guidance as to which inmates should be considered for home confinement. Staff are conducting individualized assessments to ensure inmates are appropriate for community placement both from a public safety perspective and given their own specific needs and circumstances. Additionally, we must ensure inmates who release to Home Confinement have a viable residence in which to reside.

It should go without saying that while we are dedicated to the protection of our inmates' health and safety, we also have to consider—as the Attorney General's guidance emphasized—that inmates who presented a risk of public safety because of their criminal acts or other factors cannot be released.  Neither can we release inmates who would be worse off outside Bureau facilities than inside, such as those whose medical conditions could not be adequately cared for by health systems that are themselves overwhelmed by the response to COVID infections in the general community. Nor can we release inmates who do not have safe housing for themselves or housing that is not subject to appropriate safeguards for home confinement, which is still, after all, a form of incarceration for persons convicted of crimes whereby such persons are still serving a federal sentence.

## CONCLUSION

I am honored to speak on behalf of the Bureau, the staff in our 122 institutions, and our administrative offices nationwide.  Our mission is extremely challenging, but critical to the safety and security of the public, our staff, and the inmates we house.  I thank the staff who, like first responders everywhere, are working long hours to mitigate the spread of COVID-19 in our facilities.  The Bureau can be proud of this hard work, but we understand there is still more to do.

Chairman Graham, Ranking Member Feinstein, and Members of the Committee, this concludes my formal statement.



**Covid-19 Inmates in Treatment (in Hospital or in Isolation at a BOP Facility) Rate/5,000 Inmates by Day for BOP Operated Facilities**
**Approximately 10 Percent of Inmates in BOP Facilities Tested as of 6/1/2020**

# EXHIBIT  C



### Office of the Attorney General
#### Washington, D. C. 20530

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:      THE ATTORNEY GENERAL

SUBJECT:   <u>Increasing Use of Home Confinement at Institutions Most Affected by COVID-19</u>

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.    <u>**IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**</u>

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.    **PROTECTING THE PUBLIC**

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.